QUINCE, J.
We have for review the decision of the Second District Court of Appeal in Caldwell v. State, 985 So.2d 602 (Fla. 2d DCA 2008). The district court rejected the contention that petitioner Eric Caldwell had been subjected to an unconstitutional seizure under the Fourth Amendment to the United States Constitution, and certified conflict with the opinion of the Fourth District Court of Appeal in Raysor v. State, 795 So.2d 1071 (Fla. 4th DCA 2001). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. The Second and Fourth Districts disagree as to whether an officer’s reading of Miranda[1] warnings during an otherwise consensual police encounter results in a seizure under the Fourth Amendment. For the reasons that follow, we conclude that Caldwell was not seized, approve the Second District’s denial of relief, and disapprove the decision of the Fourth District in Raysor to the extent that it is inconsistent with this opinion.
FACTUAL AND PROCEDURAL HISTORY
In Caldwell, the Second District described the facts of this case as follows:
On May 27, 2006, a security camera videotaped a burglar breaking into autos parked at the Vinoy Towers. The police were called, and St. Petersburg Police Officer T. Crisco watched the grainy, poor-quality security film of the burglaries. Although the individual features of the perpetrator were not visible, the officer was able to determine that the film showed a white male of slight build, wearing dark pants, a dark shirt, and a dark baseball cap worn backwards.
The next day, Officer Crisco observed Caldwell in a nearby park with a group of other people. Officer Crisco’s attention was drawn by the fact that Caldwell was wearing a dark t-shirt, dark pants, and a dark baseball cap, worn backwards, and that Caldwell’s build was similar to the person Officer Crisco had seen in the video. Officer Crisco drove his patrol car onto the park lawn and stopped near the crowd. He did not use his sirens or lights, and driving across the grass was routine at the park for patrol officers because of the lack of paved access. He approached Mr. Caldwell. Officer Crisco told Mr. Caldwell he would like to speak with him and directed him back towards the police cruiser. Mr. Caldwell agreed to come over to the cruiser and talk. In the ensuing conversation, Officer Crisco told Mr. Caldwell that he had seen the videotape of the break-ins at the Vinoy Towers and that Officer Crisco knew Mr. Caldwell did it. Mr. Caldwell denied involvement and denied he was the person on the videotape.
Officer Crisco read Mr. Caldwell his Miranda rights. Mr. Caldwell then asked if he was under arrest. Officer Crisco advised Mr. Caldwell that he was not under arrest but that Officer Crisco needed to ask him some questions and wanted to make sure that Mr. Caldwell was aware of his rights....
Mr. Caldwell asked Officer Crisco if he could see the tape. Officer Crisco told Mr. Caldwell that he would have to go to the Vinoy Towers to see the tape and offered Mr. Caldwell a ride. Mr. Caldwell accepted the offer of a ride in the squad car. At no time was Mr. Caldwell ordered or directed into the patrol car. Officer Crisco told Mr. Caldwell that if he was going to ride in the *192 patrol car, Officer Crisco would have to frisk him. Mr. Caldwell did not object and was frisked. Nothing was found, Mr. Caldwell got into the car, and Officer Crisco drove Mr. Caldwell, who was not cuffed or otherwise constrained, to the Vinoy Towers. Mr. Caldwell never broke off the conversation nor did he ask to leave or to get out of the patrol car.
On the way to the Vinoy Towers, Officer Crisco repeated his conviction that it was Mr. Caldwell on the tape. Upon arriving at the Vinoy Towers, before seeing the tape, Mr. Caldwell confessed to Officer Crisco. He subsequently confessed to another police officer verbally and to a detective in writing.
Caldwell, 985 So.2d at 603.
Caldwell was charged in the Sixth Judicial Circuit with three counts of felony burglary and with violating the terms of his probation. After the charges were filed, Caldwell moved to suppress the statements made to Officer Crisco, arguing that his confessions were the product of an illegal detention in violation of the Fourth and Fifth Amendments to the United States Constitution, and article I, sections 9, 12, and 16 of the Florida Constitution. The motion was initially denied following a hearing on December 4, 2006, and was denied again at a later evidentiary hearing on January 19, 2007. Following the denial of his motion, Caldwell entered a no contest plea to the burglary charges, specifically reserving his right to appeal.
Before the Second District Court of Appeal, Caldwell renewed his argument that the Miranda warnings had transformed the encounter into an illegal detention. See Caldwell, 985 So.2d at 608-04 (citing Popple v. State, 626 So.2d 185, 186 (Fla. 1993)). In making his argument, Caldwell relied on the opinion of the Fourth District in Raysor, 795 So.2d at 1071. In that case, a police officer had waved to the appellant, Freddie Raysor, in a friendly manner from across the street. Raysor approached without being asked to do so, and the officer noticed calluses on Raysor’s fingers, leading him to suspect that Raysor used crack cocaine. The officer read Raysor his Miranda rights, which Raysor waived. The officer then asked whether Raysor was in possession of cocaine or drug paraphernalia. Raysor responded that he was and produced a crack pipe. Id. At the subsequent hearing on Raysor’s motion to suppress the pipe, the officer testified that Raysor had been free to leave at all times during the encounter, but that he always read Miranda warnings “out of an abundance of caution.” Id. The trial court held that the incident was a consensual encounter and admitted the evidence produced by the search. Id.
On appeal, the Fourth District concluded that the reading of Miranda warnings had resulted in a seizure in violation of the Fourth Amendment. The court cited the case of United States v. Poitier, 818 F.2d 679 (8th Cir.1987), in which the Eighth Circuit Court of Appeals held that two travelers in an airport had been subjected to an unconstitutional seizure. In Poitier, two agents of the federal Drug Enforcement Agency approached the travelers on suspicion of carrying illegal drugs. The travelers agreed to move to a less crowded area. After the agent questioning the appellant received answers inconsistent with those given by her companion, the agent informed her that she was suspected of carrying illegal drugs and advised her of her Miranda rights. The appellant then admitted to trafficking in cocaine. Id. at 681. On appeal, the Eighth Circuit held that although the initial encounter was consensual, “[t]he accusation, coupled with the Miranda warnings, created a sufficient show of authority to effectively restrain *193 Poitier’s freedom of movement.” Id. at 683. The encounter was therefore transformed into a Terry-style[2] investigatory stop requiring reasonable suspicion of criminal activity before the seizure could legally occur. Id.
Applying the reasoning of Poitier to the facts of its case, the Fourth District concluded that Raysor had been seized illegally. The court explained:
[I]n the present case the officer gave appellant warnings which are legally required only when a person is in custody and not free to leave. Because Miranda rights are not required to be read to suspects unless they are undergoing custodial interrogation, it follows that a person who has been read his Miranda rights would reasonably assume that he is not free to leave....
... The only way appellant could have felt free to leave would have been for him to have assumed that the officer was wrong in advising him that he was entitled to court appointed counsel if he could not afford counsel right then and there.
Id. at 1072.
Two judges dissented from the en banc opinion. The dissent observed that aside from the Miranda warnings, no other circumstance surrounding the encounter was called into question. Rather, it was the Miranda warnings alone that were deemed to have resulted in the unconstitutional seizure. Id. at 1073 (Stone, J., dissenting). The dissent noted that, as the majority also recognized, the determinative question in the seizure analysis is whether, based on the totality of the circumstances surrounding the encounter, a reasonable person would believe that he or she was free to leave. Id. at 1073 (citing United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). The dissent discussed the case of California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), where the United States Supreme Court concluded that a seizure did not occur simply by virtue of an officer chasing a fleeing suspect. The Raysor dissent reasoned that simply advising a person of rights with the apparent intention of giving that person the benefit of the information, despite the fact that such advice was not mandated by law under the circumstances, is not as restraining as the chase permitted under Hodari D. Raysor, 795 So.2d at 1073.
Based on the cases discussed above, Caldwell argued before the Second District that Officer Crisco’s Miranda warning had resulted in his subjection to an unlawful seizure. After reciting the facts and holding of Raysor, however, the Second District expressed disagreement with the majority’s conclusion in that case. “[T]he crucial test,” the court explained, “is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.” 985 So.2d at 605 (quoting Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)); see United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion). The Second District concluded that the totality of the circumstances test as explained in Mendenhall and Bostick could not be satisfied based solely on the reading of a Miranda warning. Caldwell, 985 So.2d at 605. The court explained:
The purpose of the Miranda warning is to prevent an unaware citizen from surrendering his or her constitutional *194 rights out of ignorance of those rights. See Minnesota v. Murphy, 465 U.S. 420, 456, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). Advising a citizen of his rights prior to the acquisition of reasonable suspicion can only further the goals of Miranda in this regard. If anything, the warning is more likely to place a citizen on his guard against making incriminatory statements as opposed to creating a false sense of security.
Id. The court also noted that the circumstances surrounding Caldwell’s particular encounter were even less supportive of a seizure finding, observing that
when the reading of the Miranda warning is followed by a clarifying statement to the effect that the person being questioned is not under arrest, as happened in this case, a reasonable person would be on notice that he is free to disengage from the encounter should he wish to do so.
Id. Based on the totality of the circumstances, the Second District concluded that a reasonable person in Caldwell’s position would have understood that he was free to terminate the encounter. Id.
The Second District also rejected Caldwell’s contention that the encounter became an investigatory seizure when he was frisked by the officer. The court acknowledged that under normal circumstances, an officer may not conduct a protective frisk absent reasonable suspicion that a suspect is armed. See D.L.J. v. State, 932 So.2d 1133, 1134 (Fla. 2d DCA 2006). In Caldwell’s case, however, the court found that the frisk was acceptable for the purposes of officer safety in light of the fact that Caldwell was about to become a voluntary passenger in the officer’s vehicle. Caldwell, 985 So.2d at 605-06.
The Second District therefore affirmed the trial court’s denial of Caldwell’s suppression motion, affirmed his conviction, and certified conflict with Raysor. Id. at 606. This Court accepted review on May 21, 2009. Caldwell v. State, 7 So.3d 1097, 2009 WL 1427440 (Fla.2009).
ANALYSIS
The issue presented in this case is whether a person is seized under the Fourth Amendment to the United States Constitution when an officer advises that person of his or her Miranda rights. We note from the outset the divergent positions taken by the two opinions certified to be in conflict. For its part, the Fourth District seems to have concluded that as a per se matter, an officer’s reading of Miranda warnings during an otherwise consensual encounter will always result in a Fourth Amendment seizure. See Raysor, 795 So.2d at 1072. By contrast, the Second District has reasoned that because the warnings are intended to be a protective measure, Miranda warnings given during a consensual encounter may contribute to a seizure finding within the totality-of-the-circumstances framework. See Caldwell, 985 So.2d at 605. Thus, we are presented with two questions of law. First, does the reading of Miranda warnings result in a per se seizure under the Fourth Amendment? Second, if the first question is answered in the negative, what impact do the warnings have within the totality-of-the-circumstances/reasonable person analysis set out in Mendenhall? In conducting our review, we should “accord a presumption of correctness to the trial court’s rulings on motions to suppress with regard to the trial court’s determinations of historical facts,” but “independently review mixed questions of law and fact that ultimately determine constitutional issues” in the Fourth Amendment context. Globe v. State, 877 So.2d 663, 668-69 (Fla.2004) (quoting Nelson v. State, 850 So.2d 514, 521 (Fla.2003)).

*195
Seizures Under the Fourth Amendment

As this Court recently explained in G.M. v. State, 19 So.3d 973, 977 (Fla.2009), and Golphin v. State, 945 So.2d 1174, 1179 (Fla.2006), the Fourth Amendment to the United States Constitution and section 12 of Florida’s Declaration of Rights guarantee citizens the right to be free from unreasonable searches and seizures. See U.S. Const. amend. IV; art. I, § 12, Fla. Const. The protections against unreasonable searches and seizures afforded by the Florida Constitution must be construed in conformity with the Fourth Amendment to the United States Constitution as interpreted by the United States Supreme Court. See art. I, § 12, Fla. Const. Any evidence obtained in violation of this right may not be used against the defendant if such items would be excluded pursuant to the rulings of the United States Supreme Court. See Hilton v. State, 961 So.2d 284, 293 (Fla.2007); see also Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (“[A]ll evidence obtained by searches and seizures in violation of the [United States] Constitution is ... inadmissible in a state court.”).
The United States Supreme Court has determined that any warrant-less seizure of an individual by law enforcement officers must be based on reasonable suspicion that the individual is engaged in wrongdoing. Mendenhall, 446 U.S. at 552, 100 S.Ct. 1870. Whether suspicion is “reasonable” will depend on the existence of “specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.” Terry, 392 U.S. at 21, 88 S.Ct. 1868. This requirement “governs all seizures of the person, ‘including seizures that involve only a brief detention short of traditional arrest.’ ” Mendenhall, 446 U.S. at 551, 100 S.Ct. 1870 (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).
“Obviously, not all personal intercourse between policemen and citizens involves ‘seizures’ of persons.” Terry, 392 U.S. at 19 n. 16, 88 S.Ct. 1868. A seizure under the Fourth Amendment will only occur “when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.” Id. In Popple v. State, 626 So.2d 185 (Fla. 1993), this Court identified three levels of police-citizen encounters. The first level, a “consensual encounter,” involves minimal police contact and does not invoke constitutional safeguards. During a consensual encounter, an individual is free to leave at any time and may choose to ignore the officer’s requests and go about his business. Popple, 626 So.2d at 186. The second level is an “investigatory stop,” during which an officer “may reasonably detain a citizen temporarily if the officer has reasonable suspicion that a person has committed, is committing, or is about to commit a crime.” Id. (citing § 901.151, Fla. Stat. (1991)).[3] While mere suspicion is *196 insufficient to support an investigatory stop, a stop will not violate a citizen’s rights where it is based on “a well-founded, articulable suspicion of criminal activity.” Id. (citing Carter v. State, 454 So.2d 739 (Fla. 2d DCA 1984)). The third level of police-citizen encounter is an arrest, which requires probable cause on the part of the officer that a crime has been, is being, or is about to be committed. See id (citing Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); § 901.15, Fla. Stat. (1991)).
The issue we must resolve in this case is whether Officer Crisco’s actions transformed what began as a first-level consensual encounter into a second-level investigatory stop. See Popple, 626 So.2d at 186. We note from the outset that there does not seem to be any doubt that Officer Crisco lacked reasonable suspicion to justify a detention. The trial court determined at the first suppression hearing that the only basis for the encounter was a security video of poor and grainy quality. Further, the officer himself testified that he did not have any basis to detain the petitioner. Cf id. at 187 (accepting the State’s concession that the officer lacked the reasonable suspicion necessary to justify a temporary detention). The Second District accepted without reservation that reasonable suspicion was not present, noting that “Officer Crisco acknowledged that he did not have a reasonable suspicion of guilt when he approached Mr. Caldwell.” Caldwell, 985 So.2d at 604. We accept this finding for the purposes of this appeal. Accordingly, “[i]f the exchange ... was an investigatory stop and not a consensual encounter, Mr. Caldwell’s subsequent confession would have to be suppressed.” Id
This Court has explained that even without reasonable suspicion of criminal activity, police officers do not violate the prohibition on unreasonable searches and seizures simply by approaching individuals on the street and asking them to answer a few questions. Voorhees v. State, 699 So.2d 602, 608 (Fla.1997) (citing Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion)). In Mendenhall, the United States Supreme Court articulated the standard for determining whether a seizure has occurred:
[A] person has been “seized” within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even though the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer’s request might be compelled.
446 U.S. at 554, 100 S.Ct. 1870 (emphasis added) (footnote omitted). In Hodari D., the Court also held that in addition to circumstances indicating that a reasonable person would not feel free to leave, the person must either (a) in fact be physically subdued by the officer, or (b) submit to the officer’s show of authority. See 499 U.S. at 626, 111 S.Ct. 1547.
The “seizure” analysis does not depend on what the particular suspect believed, but on whether the officer’s words and actions would have conveyed to a rea *197 sonable, innocent person that he was not free to leave. Florida v. Bostick, 501 U.S. 429, 487-38, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (citing Royer, 460 U.S. at 519 n. 4, 103 S.Ct. 1319 (Blackmun, J., dissenting); see also Michigan v. Chestemut, 486 U.S. 567, 574, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (“This ‘reasonable person’ standard ... ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached.”)). However, this Court cautioned in Golphin that “[ijmplicit in the reasonable person standard is the notion that if a reasonable person would feel free to end the encounter, but does not, and is not compelled by the police to remain and continue the interaction, then he or she has consented to the encounter.” Golphin, 945 So.2d at 1182.

Miranda Warnings Generally

In accordance with the holdings of Miranda and its progeny, this Court has held that, to ensure the voluntariness of confessions, the self-incrimination clause of article I, section 9 of the Florida Constitution requires that before being subjected to custodial interrogation, “suspects must be told that they have a right to remain silent, that anything they say will be used against them in court, that they have a right to a lawyer’s help, and that if they cannot pay for a lawyer one will be appointed to help them.” Traylor v. State, 596 So.2d 957, 965-66 (Fla.1992) (footnote omitted). If a suspect is not warned of his rights, the prosecution will be barred from using statements obtained during the interrogation during its case in chief. See Michigan v. Harvey, 494 U.S. 344, 350,110 5.Ct. 1176, 108 L.Ed.2d 293 (1990); Cuervo v. State, 967 So.2d 155, 167 (Fla.2007). Further, once custodial interrogation begins, these rights must be strictly observed by the interrogating officers:
Under Section 9, if the suspect indicates in any manner that he or she does not want to be interrogated, interrogation must not begin or, if it has already begun, must immediately stop. If the suspect indicates in any manner that he or she wants the help of a lawyer, interrogation must not begin until a lawyer has been appointed and is present or, if it has already begun, must immediately stop until a lawyer is present. Once a suspect has requested the help of a lawyer, no state agent can reinitiate interrogation on any offense throughout the period of custody unless the lawyer is present, although the suspect is free to volunteer a statement to police on his or her own initiative at any time on any subject in the absence of counsel.
Traylor, 596 So.2d at 966 (footnote omitted). Thus, whether a suspect is in custody determines whether officers are required to advise the suspect of his or her Miranda rights and at what point those rights must be enforced.
The standard for “custody” is whether, based on the totality of the circumstances, a reasonable person would feel that his freedom of movement has been restricted to a degree associated with an actual arrest. Ramirez v. State, 739 So.2d 568, 573 (Fla.1999); see Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (“In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but ‘the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement’ of the degree associated with a formal arrest.”) (quoting California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)). As under the “seizure” analysis, the standard is based on “how a reasonable person in the suspect’s position would have per *198 ceived the situation.” Ramirez, 739 So.2d at 573 (quoting Davis v. State, 698 So.2d 1182, 1188 (Fla.1997)).
In Ramirez, this Court adopted a four-factor analysis, originally applied by the Supreme Court of Iowa, to determine whether a reasonable person would consider himself to be in custody under the totality of the circumstances. Factors to be considered are:
(1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning.
Id. at 574 (citing State v. Countryman, 572 N.W.2d 553, 558 (Iowa 1997)).[4] In that case, the Court noted that Ramirez was a juvenile and that “he was questioned in a small room at the police station by two detectives, he was never told he was free to leave, and all of the questions indicated that the detectives considered him a suspect.” Id. at 574. Therefore, under the totality of the circumstances, we concluded that Ramirez had been subjected to custodial interrogation and that Miranda warnings had been required before questioning began. Id.[5]
We emphasize that Miranda warnings are not required in any police encounter in which the suspect is not placed under arrest or otherwise in custody under Ramirez. See McCarty, 468 U.S. at 440, 104 S.Ct. 3138 (noting “the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda ”). In a noncustodial setting, officers are not required to discontinue questioning when a suspect indicates that he wishes to exercise his right to remain silent, nor are they required to provide a lawyer on the suspect’s request. See Miranda, 384 U.S. at 477, 86 S.Ct. 1602 (“General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.”); *199 see also United States v. Salvo, 133 F.3d 943, 949 (6th Cir.1998) (“[B]ecause of the very cursory and limited nature of a Terry stop, a suspect is not free to leave, yet is not entitled to full custody Miranda rights.”).
In the present case, it is clear that Caldwell was not placed under arrest prior to his initial confession, nor was he taken into custody. The Miranda warnings were therefore unnecessary at the time they were given. With this fact in mind, we must evaluate the impact of the warnings in light of the seizure analysis enunciated in Mendenhall.

Per Se Rides

We first address whether Miranda warnings, as a per se matter, will always transform a consensual encounter into a seizure under the Fourth Amendment. The inquiry as to whether a seizure has occurred is fact-intensive and depends heavily on the circumstances of the specific encounter at issue. See G.M., 19 So.3d at 978-79; Golphin, 945 So.2d at 1183. On multiple occasions, this Court and the United States Supreme Court have rejected the notion that any single factor in the analysis can be dispositive. As we noted in G.M., “[t]he United States Supreme Court has consistently maintained that per se rules are inappropriate in Fourth Amendment analyses of whether a ‘seizure’ has occurred.” 19 So.3d at 978 (citing United States v. Drayton, 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002); Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); Bostick, 501 U.S. at 439, 111 S.Ct. 2382); see also Golphin, 945 So.2d at 1183 (“The seizure analysis has not traditionally permitted the establishment of bright line rules.”).[6]
In Bostick, the Supreme Court rejected a holding of this Court that “an impermissible seizure result[s] when police mount a drug search on buses during scheduled stops and question boarded passengers without articulable reasons for doing so, thereby obtaining consent to search the passengers’ luggage.” 501 U.S. at 433, 111 S.Ct. 2382 (quoting Bostick v. State, 554 So.2d 1153, 1154 (Fla.1989)). We had agreed with Bostick that a reasonable person confronted by police officers on a bus would not feel free to leave because, among other factors, the bus leaves no space to move away from the officers and, had Bostick in fact disembarked, he would have been stranded at the terminal and lost whatever luggage was stored on the bus. Id. at 435, 111 S.Ct. 2382. The United States Supreme Court disagreed with our determination that such encounters result in a per se seizure, explaining that “[w]here the encounter takes place is one factor, but it is not the only one.” Id. at 437, 111 S.Ct. 2382. The case was then remanded to this Court for a determination of whether Bostick had been seized under the “totality of the circumstances” standard. Id.
Likewise, in Golphin, this Court rejected the holding of the Fourth District Court of Appeal in Baez v. State, 814 So.2d 1149 (Fla. 4th DCA 2002). The Fourth District had concluded that as a matter of law, an otherwise consensual encounter matures into a seizure when an officer retains a *200 person’s identification to conduct a check for outstanding warrants. See Golphin, 945 So.2d at 1174. In Golphin v. State, 838 So.2d 705 (Fla. 5th DCA 2003), the Fifth District had rejected the appellant’s contention, based on Baez, that he was unlawfully seized at the moment an officer retained his identification. Instead, the Fifth District explained that per se rules were inappropriate under Bostick, held that Golphin had not been seized under the totality of the circumstances, and certified conflict with Baez. Golphin, 838 So.2d at 706-08. On appeal, this Court approved the decision of the Fifth District, Golphin, 945 So.2d at 1193, explaining that the determination “does not turn solely on any one factor, but must be informed by the total circumstances of the officers’ approach, their comportment, Golphin’s reaction, and the circumstances surrounding the request for identification as well as the subsequent warrants check.” Id. at 1184. More recently, in G.M., this Court rejected a petitioner’s contention that the activation of police lights always constitutes a seizure, emphasizing that “the activation of police lights is one important factor to be considered in a totality-based analysis as to whether a seizure has occurred.” 19 So.3d at 979.
In accordance with the cases discussed above, we hold that to the extent the Fourth District determined that the mistaken administration of Miranda warnings results in a seizure as a matter of law, its conclusion was error. The proper test is whether, based on the totality of the circumstances, a reasonable person would feel free to end the encounter and depart. While an individual act on the part of an officer may constitute a show of authority that contributes to a seizure finding, we again reject the notion that any single factor, taken alone, will be conclusive in every case in which it appears.

Miranda’s Impact Within the Fourth Amendment Totality-of-the-Circumstances Analysis

Having rejected the Fourth District’s conclusion that Miranda warnings will always result in a seizure during an on-the-street police encounter, we must determine to what extent, if any, Miranda warnings increase the coercive nature of such an encounter. On one hand, the warnings are intended as a protective measure to guard against violations of a suspect’s constitutional privilege against self-incrimination. See Miranda, 384 U.S. at 444, 86 S.Ct. 1602. A citizen to whom the warnings are given, then, is at the very least aware that he has the right to remain silent and to decline to answer an officer’s questions. On the other, the warnings are required only during an arrest or custodial interrogation. See Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). Thus, in the context of an on-the-street police encounter, the warnings could operate as a show of authority on the part of the officer indicating to a reasonable person that he or she is not free to leave.
In Caldwell, the Second District took the position that Miranda warnings serve to protect the rights of a citizen during a police encounter. This conclusion is certainly consistent with the intent behind the warnings. In Miranda, the United States Supreme Court reasoned that a citizen will be protected from surrendering his or her rights out of ignorance of those rights where the citizen is first made aware of them. The citizen is also placed on guard that the waiver of those rights may have negative consequences:
[Wjhatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure *201 that the individual knows he is free to exercise the privilege at any point in time.
... Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system — that he is not in the presence of persons acting solely in his interest.
Miranda, 384 U.S. at 469, 86 S.Ct. 1602. Under this line of reasoning, citizens who are first given Miranda warnings should be better able to protect their constitutional rights, regardless of the context. See, e.g., Luna-Martinez v. State, 984 So.2d 592, 601 (Fla. 2d DCA 2008) (explaining that Miranda warnings weighed in favor of the conclusion that the defendant had voluntarily consented to a search because he had been informed that he was not required to talk to police).
In part due to the protective nature of the Miranda warnings, some courts have declined to interpret them as a restraint on freedom in the context of a consensual interview with law enforcement personnel. See, e.g., Davis v. Allsbrooks, 778 F.2d 168 (4th Cir.1985) (declining to hold that a suspect was in custody during a police station interview, despite the reading of Miranda warnings, where no other action by the officers was coercive or established custody); United States v. Charles, 738 F.2d 686, 694 n. 6 (5th Cir.1984) (agreeing •with the conclusion of the Sixth Circuit Court of Appeals in Lewis that Miranda warnings do not help produce a custodial interrogation); United States v. Lewis, 556 F.2d 446, 447-48 (6th Cir.1977) (finding that the giving of Miranda warnings prior to an otherwise voluntary police station interview is not evidence of formal arrest and does not contribute to a finding that a suspect is in custody for Miranda purposes). These courts have reasoned that if Miranda warnings alone entitled a suspect to additional constitutional protections, officers would be given an incentive to refrain from informing suspects of their rights. See Davis, 778 F.2d at 172 (noting that such a holding “would convert admirable precautionary measures on the part of officers into an investigatory obstruction”).
Conversely, other courts have determined that at the very least, the Miranda warnings are a factor to be considered in evaluating whether a suspect has been placed in custody under the Fifth Amendment.[7] In Sprosty v. Buckler, 79 F.3d 635, 638-39 (7th Cir.1996), a suspect was given Miranda warnings shortly after officers arrived at his home to execute a search warrant. In evaluating whether the suspect had been placed in custody before he revealed physical evidence to the police, the court noted that by reading the warnings, the officers had followed a formality of custodial arrest without actually informing the suspect that he was not under arrest. Id. at 642. While not dispositive, this fact provided at least some support for the inference that the defendant was in custody. See id.; see also United States v. Erving L., 147 F.3d 1240, 1248 n. 5 (10th Cir.1998); United States v. Bautista, 145 F.3d 1140, 1148 (10th Cir.1998); Tukes v. Dugger, 911 F.2d 508, 516 n. 10 (11th Cir.1990).
We believe that the same reasoning applies in the context of a Fourth Amendment investigatory stop. Miranda warn *202 ings are a formality of arrest and are required only at the time of an arrest or prior to custodial interrogation. Further, the warnings are associated in the public mind with the spectacle of an individual being placed under arrest. Therefore, it is not unreasonable to conclude that an individual who is given Miranda warnings during what begins as a consensual encounter may interpret those warnings as a restraint on his or her freedom.[8] For this reason, courts that have considered the application of Miranda in the context of an on-the-street police encounter have generally found it to be at least a factor in determining whether an individual has been subjected to an illegal investigatory stop under the Fourth Amendment. See, e.g., Poitier, 818 F.2d at 683; United States v. Lara, 638 F.2d 892, 898 n. 10 (5th Cir.1981) (“Giving Miranda warnings in a police-citizen encounter which is otherwise a nondetention interrogation may very well elevate such an encounter to a seizure within the meaning of Terry in light of the public’s association of Miranda warnings with an arrest.”); see also United States v. Montgomery, 377 F.3d 582, 587 (6th Cir. 2004) (noting that the district court listed the reading of Miranda rights as one factor indicating that a reasonable person in the defendant’s position would not have felt free to leave).
This conclusion on the part of a reasonable person would be further supported by the fact that outside the context of an arrest or custodial interrogation, not all of the stated rights apply. In particular, Miranda requires that suspects be advised that they have the right to an attorney and that if they cannot afford an attorney one will be provided for them. See Traylor, 596 So.2d at 965-66. While this advisory warning is true during a custodial interrogation, it is not true during a consensual encounter or investigatory stop. See Miranda, 384 U.S. at 477, 86 S.Ct. 1602; Salvo, 133 F.3d at 949. This reasoning was adopted by the Fourth District in Raysor, which noted that “[t]he only way appellant could have felt free to leave would have been for him to have assumed that the officer was wrong in advising him that he was entitled to court appointed counsel if he could not afford counsel right there and then.” 795 So.2d at 1072.
Based on our above discussion, we believe that the reading of Miranda warnings during a consensual police encounter might add to the coercive nature of that encounter under at least some circumstances. For example, what begins as an on-the-street consensual encounter may take on characteristics of a seizure where the warnings operate more as a show of authority that would indicate to a reasonable person that he is not free to leave. By contrast, during a voluntary interview at a police station in which the atmosphere is more formal and the citizen may already be aware that he or she is suspected of criminal activity, the reading of Miranda rights may serve as intended, i.e., as a protective measure placing the citizen on guard “that he is not in the presence of persons acting solely in his interest.” Miranda, 384 U.S. at 469, 86 S.Ct. 1602. As with every other factor under the Menden-hall test, whether an erroneously given Miranda warning contributes to a seizure finding under the Fourth Amendment must be decided on a case-by-case basis.

This Case

We conclude that the totality of the circumstances in Caldwell’s police encounter did not result in a seizure. We *203 note that Caldwell was approached in a public area, during the daytime, and in the presence of others. The officer did not use lights or sirens, see G.M., 19 So.3d at 974, nor did he drive his vehicle into the park in a manner uncommon for the area. There was no “threatening presence” of multiple officers, and there is no evidence that the officer displayed a weapon. See Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870. Although the Second District stated that Officer Crisco “directed” Caldwell away from the group, the record does not indicate that he did so in a commanding or intimidating manner.[9] It is true that the officer confronted Caldwell about the burglaries and expressed his belief that Caldwell had committed them. While this certainly contributed to the coercive atmosphere of the encounter, we do not believe the accusation and subsequent questioning resulted in an investigatory seizure when viewed within the totality of the circumstances. Again, officers are not prohibited from merely approaching a citizen in public and asking questions regarding criminal activity. See Voorhees, 699 So.2d at 608. To prevail, Caldwell must point to some actual physical force or show of authority on the part of the officer. See Terry, 392 U.S. at 19 n. 16, 88 S.Ct. 1868.
With regard to the officer’s reading of Miranda warnings, we acknowledged above that the warnings might in some circumstances indicate to a reasonable person that he or she is being arrested and therefore not free to leave. Here, however, Caldwell asked the officer why he was being arrested and was specifically informed that he was not under arrest, but rather that the officer merely wanted to make sure Caldwell was aware of his rights. A reasonable person, having received this clarification, would not have believed that he was under arrest. Further, the circumstances of the encounter after the warnings indicate that the tenor of the conversation remained consensual. In particular, we note that Caldwell was given the option of viewing the security video, which he accepted. The officer did not threaten to take Caldwell to the police station or place him under formal arrest. When Caldwell was placed in the police car he was not handcuffed or otherwise restrained inside the vehicle. Caldwell was also aware, due to the Miranda warnings, that he had the right to remain silent.[10]
Nor do we think Caldwell was seized as a result of the pat-down search conducted by the officer. First, although the record does not indicate whether explicit consent was given, Caldwell appears to have given his implicit consent to the *204 search. Caldwell was informed in advance that he would be frisked as a condition of accepting a ride in the officer’s vehicle and did not object to this condition. See State v. Iaccarino, 767 So.2d 470, 477 (Fla. 2d DCA 2000) (listing, as one factor used by courts to evaluate implied consent, whether a defendant was aware in advance that his conduct would subject him to a search). Second, we note that Caldwell is not objecting to anything discovered as a result of the frisk itself. Therefore, even if, as Caldwell asserts, the search was illegal for lack of consent or reasonable suspicion that he was armed, it would still have to be demonstrated that a reasonable person would not have felt free to leave at the time he made the incriminating statements.[11] Given that Caldwell was informed that he would be frisked in advance, that he failed to object, and that nothing was actually discovered as a re-suit, we find that the overall coercive impact of the pat-down was minimal within the totality of the circumstances of the encounter.[12]
CONCLUSION
Based on the totality of the circumstances, we conclude that a reasonable person in Caldwell’s position would have understood that he was free to remain silent or end the encounter had he chosen to do so. Further, we hold that Miranda warnings do not result in a seizure as a matter of law. While we do not discount that possibility that Miranda warnings may increase the coercive atmosphere of a police-citizen encounter outside the context of a custodial interrogation, we find that the warnings did not result in a seizure in this case. Accordingly, we approve the decision of the Second District in Caldwell *205 to the extent that it is consistent with this opinion, and disapprove the opinion of the Fourth District in Raysor to the extent that it is inconsistent with this opinion.
It is so ordered.
CANADY, C.J., and POLSTON, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs in result only.
PARIENTE, J., concurs in part and dissents in part with an opinion.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).

. 1. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. In Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the United States Supreme Court explained the permitted scope of such an encounter:
Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose ‘‘observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion.” "[The] stop and inquiry must be ‘reasonably related in scope to the justification for their initiation.' ” Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer’s suspicions. But the detainee is not obliged to *196 respond. And, unless the detainee’s answers provide the officer with probable cause to arrest him, he must then be released. Id. at 439-40, 104 S.Ct. 3138 (quoting Brigno-ni-Ponce, 422 U.S. at 881, 95 S.Ct. 2574) (citations and footnotes omitted).

. This Court noted, however, that whereas in Iowa the factors are applied as a four-factor "test,” in Florida they are simply "considered” under the totality of the circumstances approach. Id. (citing Caso v. State, 524 So.2d 422, 424 (Fla. 1988); Roman v. State, 475 So.2d 1228, 1231 (Fla.1985); Drake v. State, 441 So.2d 1079, 1081 (Fla.1983)).

. While the question of whether a person is in custody is related to the issue of whether that person has been subjected to an unconstitutional seizure, the analyses are in fact distinct. In United States v. Newton, 369 F.3d 659, 669-72 (2d Cir.2004), the Second Circuit Court of Appeals noted some confusion in its precedent regarding how the question of whether a suspect was "free to leave,” the seizure test under Mendenhall, interacted with the issue of custody. It explained:
[A] free-to-leave inquiry reveals only whether the person questioned was seized. Because seizure is a necessary prerequisite to Miranda, however, it makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the Miranda inquiry is at an end; the challenged interrogation did not require advice of rights. On the other hand, if a reasonable person would not have thought himself free to leave, additional analysis is required because ... not every seizure constitutes custody for purposes of Miranda. In such cases, a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest. Only if the answer to this second question is yes was the person " 'in custody' for practical purposes,” and "entitled to the full panoply of protections prescribed by Miranda.”
Newton, 369 F.3d at 672 (emphasis added) (citations omitted) (quoting Berkemer v. McCarty, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

. But see Golphin, 945 So.2d at 1197 (Par-iente, J., concurring in result only) (“[T]he totality of the circumstances test 'does not mean that each and every circumstance in the case must be assumed to have the same degree of relevance and weight.' There are times when one circumstance among the totality converts what would otherwise be a consensual encounter into a detention.'') (quoting United States v. Jordan, 958 F.2d 1085, 1087 (D.C.Cir. 1992)).

. In discussing the debate among courts over the impact of Miranda warnings in the context of the Fifth Amendment custody analysis, the Eighth Circuit referred to this position as the "transformation” argument. The court adopted this term because the petitioner "argue[d] that the Agents' reading of the Miranda rights transformed an otherwise noncustodial interrogation into a custodial interrogation, one in which a suspect deserves Miranda’s protections.” United States v. Harris, 221 F.3d 1048, 1051 n. 3 (8th Cir.2000).

. In the present case, for example, after the warnings were read Caldwell immediately asked why he was being arrested.

. To some extent, any encounter with a uniformed police officer may lead to some apprehension on the part of a citizen. See Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (“Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime."). However, this fact alone cannot support a seizure finding under the Fourth Amendment, see Terry, 392 U.S. at 19 n. 16, 88 S.Ct. 1868, and we do not find the mere fact that the officer was in uniform to have been particularly coercive in this case.

. While Caldwell had also been (incorrectly) warned that he had the right to an attorney, we note that he did not attempt to invoke this right. If he had done so and been informed that he was not entitled to counsel, the mistaken reading of the Miranda warnings might have contributed more significantly to the co-erciveness of the encounter. See Tukes, 911 F.2d at 516 n. 11 (suggesting that it would greatly increase the coerciveness of an interrogation if officers were to inform a suspect of his right to appointed counsel but then deny his request for an attorney).

. It is established law that an officer may not conduct a frisk without reasonable suspicion that the suspect is armed with a dangerous weapon. See § 901.151(5), Fla. Stat. (2009). We note, however, that in every case but one cited by the petitioner, the suspect objected to the admission of evidence discovered on his or her person during the search. See Hidalgo v. State, 959 So.2d 353 (Fla. 3d DCA 2007) (objecting to drugs discovered during frisk); D.L.J., 932 So.2d at 1133 (concealed firearm); Hines v. State, 737 So.2d 1182 (Fla. 1st DCA 1999) (knife); Hunt v. State, 700 So.2d 94 (Fla. 2d DCA 1997) (drugs); Sholtz v. State, 649 So.2d 283 (Fla. 2d DCA 1995) (drugs); Beasley v. State, 604 So.2d 871 (Fla. 2d DCA 1992) (drugs); Harris v. State, 574 So.2d 243 (Fla. 1st DCA 1991) (evidence of burglary and grand theft). None of these cases involved a situation where, as here, a defendant argued that an unconstitutional frisk prevented the admission of a statement or physical evidence obtained at a later time.
The exception is Navamuel v. State, 12 So.3d 1283 (Fla. 4th DCA 2009), in which officers conducted an illegal pat-down of the defendant in front of his home, then immediately obtained his consent to search the residence. The defendant later objected to the admission of evidence seized from the house. However, the court did not analyze whether the defendant had been seized under the Fourth Amendment, but instead based its holding on the invalidity of the consent. Id. at 1286 (citing Delorenzo v. State, 921 So.2d 873, 879 (Fla. 4th DCA 2006)). Accordingly, we find that it is not directly relevant to the case at bar.

. We find it unnecessary to review the "officer safety” exception relied on by the Second District. See Caldwell, 985 So.2d at 606. We note only that its application appears to be strictly limited to circumstances where a citizen voluntarily becomes a passenger in the officer’s vehicle, but neither objects nor consents to being searched. Obviously, if a citizen voluntarily accepts a ride in a police vehicle but does object to being frisked, the search would be illegal absent reasonable suspicion that the suspect is armed. See § 901.151(5), Fla. Stat. (2009). Conversely, if the citizen accepts a ride but consents to being searched, the search would be presumed legal so long as consent was given freely and voluntarily. See Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); Washington v. State, 653 So.2d 362, 364 (Fla. 1994).