GROSS, C.J.
 

 This case is a paradigm for a type of case that is common in our courts, where “consent” to a search is found under objectively questionable circumstances.
 

 Freddie Ruiz was charged with trafficking in cocaine and possession of cannabis. He moved to suppress, alleging that the evidence was the product of an unlawful search and seizure. The trial court denied the dispositive motion and Ruiz now has appealed to this court.
 

 At the hearing on the motion, detectives testified they received an anonymous tip that a person with dreadlocks was selling narcotics from a certain apartment. The same afternoon that the police received the tip, two detectives drove to the location and parked across the street. After a few minutes, Ruiz left the apartment. He had dreadlocks.
 

 The detectives drove their unmarked car into the parking lot of the complex. They got out of then* car and “nonchalantly” or “casually” approached Ruiz. One detective “calmly” asked Ruiz his name and he “calmly” replied that it was “Freddie” and that “he had his identification in his apartment, if [the officer] would like to see it.” One detective said that he wanted to see it and Ruiz led the two law enforcement agents up to his apartment. Ruiz went inside and “motioned” or “nodded” at the detectives to enter, so they went inside. Ruiz walked through the living room into the bedroom; one detective followed and waited at the entrance to the bedi'oom. From this vantage point, the detective saw a scale and silver spoon with cocaine residue in the scoop part of the spoon. The detective asked Ruiz if the substance was cocaine, and Ruiz admitted it was. The detectives then “detained” Ruiz and read him his
 
 Miranda
 
 rights. Ruiz was most cooperative — he told them that additional cocaine was located in a Barbasol shaving cream can and “weed” was inside his dresser di’awer.
 

 Ruiz also testified at the suppression hearing. His version of events differed substantially from that of the detectives. Ruiz was on his way back from the store when three officers stopped them vehicle in front of him, jumped out with their guns drawn, and told him not to move. Ruiz did
 
 *1231
 
 not think he was free to leave. One officer frisked him and asked for his identification. Ruiz said he did not have any identification and the police said they would arrest him if he could not produce some identification. Ruiz said that his identification was in his apartment. The officers escorted him to his apartment. After he opened the door, the officers went inside and searched through everything. Ruiz did not give the officers permission to enter his residence.
 

 The trial judge found the officers “very credible” and Ruiz’s “testimony” “not credible.” Based on the “totality of the circumstances,” the court found that “this was a citizen’s encounter” where Ruiz “allowed” the police to “come in” to his apartment.
 

 In reviewing an order on a motion to suppress, an appellate court defers to the trial court’s factual findings but reviews de novo the application of the law to the facts.
 
 E.g., Pantin v. State,
 
 872 So.2d 1000, 1002 (Fla. 4th DCA 2004). A search conducted pursuant to consent is an exception to the Fourth Amendment requirements of a warrant or probable cause.
 
 Schmeckloth v. Bustamonte,
 
 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Where consent to a search is the issue, “the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.”
 
 Florida v. Royer,
 
 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The state must prove voluntariness by a preponderance of the evidence,
 
 Jorgenson v. State,
 
 714 So.2d 423, 426 (Fla.1998), but if there has been an illegal detention, the state must establish by clear and convincing evidence that the consent was not a product of the illegal police action.
 
 Reynolds v. State,
 
 592 So.2d 1082, 1086 (Fla.1992).
 

 Whether consent is voluntary is a question of fact to be determined from the totality of the circumstances.
 
 McDonnell v. State,
 
 981 So.2d 585, 588 (Fla. 1st DCA 2008). “Consent to search may be in the form of conduct, gestures, or words.”
 
 State v. Gamez,
 
 34 So.3d 245, 247 (Fla. 2d DCA 2010). To decide whether a consent is voluntary, courts consider a number of factors, including the time and place of the encounter, the number of police officers present, the officers’ words and actions, and the age, education, or mental condition of the person detained.
 
 Hardin v. State,
 
 18 So.3d 1246, 1248 (Fla. 2d DCA 2009);
 
 State v. Evans,
 
 9 So.3d 767, 769 (Fla. 2d DCA 2009). “[A] private home, as here, is an area where a person enjoys the highest reasonable expectation of privacy under the Fourth Amendment[.]
 
 [S]ee, e.g., Payton v. New York,
 
 445 U.S. 573, 585, 589-90, 100 S.Ct. 1371, 63 L.Ed.2d 639, (1980). [Therefore,] the factors bearing on the vol-untariness of a consent to search a home must be scrutinized with special care.”
 
 Gonzalez v. State,
 
 578 So.2d 729, 734 (Fla. 3d DCA 1991) (parallel citations omitted). Central to the idea of a consensual encounter “is the notion that if a reasonable person would feel free to end the police encounter, but does not, and is not compelled by the police to remain and continue the interaction, then he or she has consented to the encounter.”
 
 Golphin v. State,
 
 945 So.2d 1174, 1182 (Fla.2006).
 

 Over time, the concept of “consent” to a search has become divorced from its common meaning. In the Fourth Amendment context, “consent” has come to mean that set of circumstances that the law will tolerate as an exception to the probable cause or warrant requirement. What passes for “consent” today would not have survived a motion to suppress 25 years ago. Now, even aggressive conduct by the police will not necessarily vitiate
 
 *1232
 
 “consent” when viewed as a part of the “totality of the circumstances.” Thus, in
 
 Golphin v. State,
 
 the Supreme Court rejected the concept that, as a matter of law, an otherwise consensual encounter matures into a seizure when an officer retains a person’s identification to conduct a check for outstanding warrants.
 
 Id.
 
 at 1187-89. Similarly, in
 
 Caldwell v. State,
 
 41 So.3d 188 (Fla.2010), the Supreme Court held that the administration of
 
 Miranda
 
 warnings, as a matter of law, does not transform a consensual encounter into a seizure. Under
 
 Golphin
 
 and
 
 Caldwell,
 
 the challenged police conduct was but one factor to be considered in the totality of the circumstances.
 

 The “totality of the circumstances” approach has expanded the concept of “consent” in a way that has had a significant effect on the administration of criminal justice. It allows a trial court to rely on other factors that swallow aggressive police conduct and contract the limits of Fourth Amendment protection.
 

 In many cases, the police rely upon a defendant’s voluntary consent to justify a search or a stop. One possibility is that citizens, especially those involved in crimes, have a desire to cooperate with the police to avoid making waves. Another possibility, far more sinister, is that the police have come to recognize that “consent” is the catch-all exception to the Fourth Amendment, so they tailor their testimony accordingly.
 

 After
 
 Mapp v. Ohio,
 
 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), applied the exclusionary rule to state prosecutions, one trial judge noticed the profusion of “dropsy” testimony in New York City— testimony by police officers that a defendant dropped drugs onto the street upon seeing the police:
 

 Were this the first time a policeman had testified that a defendant dropped a packet of drugs to the ground, the matter would be unremarkable. The extraordinary thing is that each year in our criminal courts policemen give such testimony in hundreds, perhaps thousands, of cases — and that, in a nutshell, is the problem of ‘dropsy’ testimony. It disturbs me now, and it disturbed me when I was at the Bar. Younger, ‘The Perjury Routine,’
 
 The Nation,
 
 May 8, 1967, p. 596:
 

 < ⅜ * ⅜ policemen see themselves as fighting a two-front war — against criminals in the street and against ‘liberal’ rules of law in court. All’s fair in this war, including the use of perjury to subvert ‘liberal’ rules of law that might free those who ‘ought’ to be jailed * * * It is a peculiarity of our legal system that the police have unique opportunities (and unique temptations) to give false testimony. When the Supreme Court lays down a rule to govern the conduct of the police, the rule does not enforce itself. Some further proceeding * * * is almost always necessary to determine what actually happened. In
 
 Mapp v. Ohio,
 
 for example, the Supreme Court laid down the rule that evidence obtained by the police through an unreasonable search and seizure may not be used in a state criminal prosecution. But before applying the rule to any particular case, a hearing must be held to establish the facts. Then the judge decides whether those facts constitute an unreasonable search and seizure. * * * The difficulty arises when one stands back from the particular case and looks at a series of cases. It then becomes apparent that policemen are committing perjury at least in some of them, and perhaps in nearly all of them. Narcotics prosecutions in New York City can be so viewed. Before
 
 Mapp,
 
 the policeman typically testified that he stopped the defendant for little or no reason,
 
 *1233
 
 searched him, and found narcotics on his person. This had the ring of truth. It was an illegal search (not based upon ‘probable cause’), but the evidence was admissible because
 
 Mapp
 
 had not yet been decided. Since it made no difference, the policeman testified truthfully. After the decision in
 
 Mapp,
 
 it made a great deal of difference. For the first few months, New York policemen continued to tell the truth about the circumstances of their searches, with the result that evidence was suppressed. Then the police made the great discovery that if the defendant drops the narcotics on the ground, after which the policeman arrests him, the search is reasonable and the evidence is admissible. Spend a few hours in the New York City Criminal Court nowadays, and you will hear case after case in which a policeman testifies that the defendant dropped the narcotics on the ground, whereupon the policeman arrested him. Usually the very language of the testimony is identical from the case to another. This is now known among defense lawyers and prosecutors as ‘dropsy’ testimony. The judge has no reason to disbelieve it in any particular case, and of course the judge must decide each case on its own evidence, without regard to the testimony in other cases. Surely, though, not in every case was the defendant unlucky enough to drop his narcotics at the feet of a policeman. It follows that at least in some of these cases the police are lying.
 

 People v. McMurty,
 
 64 Misc.2d 63, 314 N.Y.S.2d 194, 195-96 (N.Y.Crim.Ct.1970) (Younger, J.). “Dropsy” in 1970 has evolved into “consent” in 2010. The more things change the more they stay the same.
 

 The profusion of consent cases requires trial judges, the gatekeepers of the Fourth Amendment, to critically evaluate the testimony given at hearings. Cases like this one call into question the fairness of some trial court proceedings. On the pages of the record, the story told by the police is unbelievable — an anonymous informant gives incriminating information; police surveillance uncovers no criminal conduct; the defendant is “nonchalantly” and “casually” approached by the police on the street; the defendant cooperatively leads the police back to his apartment to obtain his identification and invites the police inside, where a detective sees contraband in plain view, a fact certainly known to the defendant when he issued the invitation; after his arrest, the defendant tells the police about all the hidden drugs in the apartment.
 

 Yet, as an appellate court, we must defer to the express finding of credibility made by the trial court. We were not there. We did not see the witnesses testify. If believed, the detectives’ testimony supports the court’s ruling. This case demonstrates the importance of an independent judiciary. This case involves the search of a person’s home, but were the factors bearing on the voluntariness of the consent scrutinized “with special care?” Without an unbiased and objective evaluation of testimony, judges devolve into rubber stamps for law enforcement. The judge may have punctiliously performed the duties of his office in this case, but, when considering the large number of “consent” cases that have come before us, the finding of “consent” in so many curious circumstances is a cause for concern.
 

 Affirmed.
 

 DAMOORGIAN and MAY, JJ., concur.