63 So.3d 807 (2011)
Joshua LADSON, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D09-452.
District Court of Appeal of Florida, Third District.
May 4, 2011.
Carlos J. Martinez, Public Defender, and Joanna Ingalls, Assistant Public Defender, for appellant.
Pamela Jo Bondi, Attorney General, and Ansley B. Peacock, Assistant Attorney General, for appellee.
Before SHEPHERD and SALTER, JJ., and SCHWARTZ, Senior Judge.
PER CURIAM.
Joshua Ladson appeals his conviction of manslaughter by culpable negligence with a firearm, as a lesser included offense of second degree murder with a firearm, and his sentence. He contends that the trial court erred in denying his motion to suppress his confession. We affirm.
The testimony at the suppression hearing established that a homicide detective for Miami-Dade County was assigned to investigate the shooting death of a motorcyclist. After receiving numerous Crime Stoppers tips, the detective identified Ladson as a person of interest during the week following the shooting. At the time, Ladson was 16 years old. On the morning of the ninth day following the shooting, the detective and three other officers on his investigative team surveilled Ladson's home, anticipating a chance to speak with him as he left for school.[1]
*808 Although initially distracted by the departure of Ladson's older brother from the home, the team ultimately observed Ladson leaving the back of the house, followed him, and asked him for identification. The lead detective then asked Ladson, with Ladson standing outside the police car and not in handcuffs, whether he was willing to come and talk further with the detective further about an investigation. Ladson said "no problem," but he did ask if the detective thought Ladson could be back in time to go to football practice. The detective responded that it depended on how the interview went. The detective did not tell Ladson that he did not have to accompany him to the police station.[2]
Ladson was frisked for officer safety outside the police car before the drive to the police station. He sat in the front seat of the police car and was not handcuffed. The lead detective asked Ladson for a parent's telephone number and tried unsuccessfully to contact his mother.[3] At the station, Ladson was taken to an interview room. He was offered something to drink, food, and bathroom breaks, and he was told that he could ask for any of those at any time. After about ten minutes of preliminary interview questions, he signed a written Miranda[4] warning.
The officers made four separate calls to reach Ladson's mother or father, but these were unavailing until later in the day. Initially, Ladson denied any knowledge of, or involvement in, the shooting. Later (a little over two hours after his arrival at the station), Ladson implicated another person in the shooting, and then claimed that his half-brother had fired the gun that killed the victim. About three hours after he arrived at the station, Ladson admitted to being the shooter. After additional questions and a break for food, Ladson was again given his Miranda rights and the lead detective obtained a sworn statement (transcribed and videotaped). The lead detective testified that he did not consider Ladson to be in custody until after he provided the sworn statement.

Analysis
The trial court held that Ladson's first encounter with the police as he was walking away from his back door was consensual, and not a Terry[5] stop. The court found that Ladson accompanied the officers voluntarily and that the frisk for officer safety before the drive to the police station also was voluntary, relying upon Caldwell v. State, 985 So.2d 602 (Fla. 2d DCA 2008).[6]
*809 The trial court then analyzed the Miranda requirements appropriately under the tests established in Ramirez v. State, 739 So.2d 568, 574 (Fla.1999), and Roman v. State, 475 So.2d 1228, 1231 (Fla.1985). The question presented on review is whether any reasonable person in Ladson's position would have believed that functionally he was under arrest and not free to go.
As the Florida Supreme Court has recently reiterated, these are fact-laden inquiries depending "heavily on the circumstances of the specific encounter at issue." Caldwell, 41 So.3d at 199. The trial court's assessment of the credibility of the lead detective is entitled to deference here.
Ladson and our dissenting colleague have urged us to follow B.S. v. State, 548 So.2d 838 (Fla. 3d DCA 1989). In B.S., a 17 year-old was told by two detectives at her home (in the absence of a parent, and while baby-sitting her younger brother) that they "wanted" her to come to the station for questioning. When she expressed concern that she could not leave her brother alone, the officers told her that they would take him to the station with her (and did exactly that). Id. at 839. This Court concluded, with a dissent, that this scenario was functionally equivalent to an arrest and reversed a trial court order denying a motion to suppress her confession.
These cases are fact-intensive and occasionally close (to address our learned colleague's criticism for mentioning that there was a dissent from his majority opinion in B.S. in 1989). Our colleague's enthusiastic dissent in this case is reflected in other recent commentaries on the evolution of the law of "consent:"
Over time, the concept of "consent" to a search has become divorced from its common meaning. In the Fourth Amendment context, "consent" has come to mean that set of circumstances that the law will tolerate as an exception to the probable cause or warrant requirement. What passes for "consent" today would not have survived a motion to suppress 25 years ago. Now, even aggressive conduct by the police will not necessarily vitiate "consent" when viewed as part of the "totality of the circumstances." Thus, in Golphin v. State [,945 So.2d 1174 (Fla.2006)], the Supreme Court rejected the concept that, as a matter of law, an otherwise consensual encounter matures into a seizure when an officer retains a person's identification to conduct a check for outstanding warrants. Id. at 1187-89. Similarly, in Caldwell v. State, 41 So.3d 188 (Fla.2010), the Supreme Court held that the administration of Miranda warnings, as a matter of law, does not transform a consensual encounter into a seizure. Under Golphin and Caldwell, the challenged police conduct was but one factor to be considered in the totality of the circumstances.
The "totality of the circumstances" approach has expanded the concept of "consent" in a way that has had a significant effect on the administration of criminal justice. It allows a trial court to rely on other factors that swallow aggressive police conduct and contract the limits of Fourth Amendment protection.
Ruiz v. State, 50 So.3d 1229, 1231-32 (Fla. 4th DCA 2011). In Ruiz, and in Judge Hazouri's special concurrence citing Ruiz,[7] however, the trial court's denial of a motion to suppress based on "consent" was affirmed. In those cases, as here:

*810 ... [A]s an appellate court, we must defer to the express finding of credibility by the trial court. We were not there. We did not see the witnesses testify. If believed, the detective's testimony supports the court's ruling.
Id. at 1233. The trial judge in this case, as in Ruiz, "punctiliously performed the duties of [her] office in this case" and did not "devolve into a rubber stamp for law enforcement." Id.
After a careful review of the record in this case, we conclude that the trial court diligently applied Ramirez and Caldwell (the ultimately-approved district court opinion in that case) to the police interaction with Ladson as it moved from initial encounter to confession. We will simply agree to disagree with our respected colleague as to (a) whether the manner in which the detective parked his vehicle in the swale alongside the street travelled by Ladson, and the scenario when a second vehicle arrived (neither vehicle activated emergency lights), were coercive; (b) whether the majority opinion in B.S. 22 years ago is distinguishable on its own facts; and (c) whether the majority has created and applied some "mythical doctrine."
Affirmed.
SHEPHERD and SALTER, JJ., concur.
SHEPHERD, J., concurring.
I concur in the affirmance of the judgment of conviction and sentence in this case.
The dissenting opinion creates an image of a police car careening to a halt in the footpath of an unsuspecting citizen, urgency exuding, and an officer leaping forward to "ask" the person to "come to the station." If these were the facts of the case, I would agree that Joshua Ladson's confession should have been suppressed. The problem is this image does not square with the record.
The incident involved two unmarked police units under the command of lead officer, Detective Juan Segovia. One of the two vehicles, occupied by Detective Segovia and Detective Mike Dominguez, was stationed in front of the house where the defendant and his brother, Michael Ladson, lived, awaiting Michael's return from inside the house with identification. While waiting for Michael to emerge, the detectives observed a young black male exit from the side or back of the house and walk down the middle of the street to the east. Because Detective Segovia and his partner were occupied, Detective Segovia called the officers in the second unit, Sergeant Peter Andreu and Detective Larry Belyeu, who were parked about two blocks away, to see if they could approach and identify the individual who had just left the house. Sergeant Andreu and Detective Belyeu did so. Within minutes, Detectives Segovia and Dominguez, having given up on Michael coming out of the house again, drove to where the other officers found the defendant. The only testimony as to the location of the second unit, occupied by Sergeant Andreu and Detective Belyeu, who made the initial stop of Joshua, was that of Detective Segovia, the only witness at the suppression hearing. His testimony was as follows:
Q Okay. All right. So when you come up to Joshua Ladson, can you tell us where he is?
A He's standing on theon the roadway and my sergeant's car was parked like on the, kind of like half in the grass half on the road, and they were just talking to him outside the car.
There is no testimony in the record about how Sergeant Andreu and Detective Belyeu approached Joshua in their vehicle, or the speed at which the vehicle travelled. *811 Any suggestion they took some action, either personally or with their vehicle, which constitutes evidence that Joshua was being taken into custody, is incorrect.
Nor does the answer to Joshua's question about whether he would be back in time for football practice connote anything sinister. The testimony of Detective Segovia on this topic, which continues immediately following the testimony just quoted, is as follows:
Q Okay. He'sJust so we're a hundred percent clear, he's inside or outside a police [car] at this time?
A Outside a police car.
Q And he's standing on the street?
A Yes, sir.
Q Can you tell us if he's in handcuffs?
A He's not. No, he's not cuffed.
Q So he's standing on the street, not in handcuffs, not in the police car. Did you ask him his name?
A Yes, sir.
Q What does he say?
A He told me his name was Joshua Ladson.
Q Did you ask him any information regarding his age or date of birth?
A He provided his date of birth.
Q And whatWhen he told you his date of birth, how old did he turn out to be?
A I believe he was sixteen at the time, if I'm correct.
Q All right. At that time what did you ask him?
A At that time I asked him if he was willing to come and talk to me at the office reference an investigation.
Q And when you asked him if he'd mind going back to the office to talk about aan investigation, what did he say?
A He said no problem. His only question was if I felt he would be back on time to go to football practice.
Q Okay. And what did you tell him whenwhen he asked if hehe would be back for football practice?
A I told him that all depended on how the interview-on how the interview went.
Q Was he under arrest?
A No, sir.
In fact, the answer provided by Detective Segovia is likely the only response that would not support the suppression of Joshua's confession. Had Detective Segovia replied that Joshua would certainly not be able to attend football practice, such an answer would have indicated to a reasonable person that Joshua was not free to leave. On the other hand, had he replied that Joshua definitely would be able to attend football practice regardless of his statement to police, this answer would have suggested Joshua's confession was obtained through a deceptive statement, as it could be understood as a promise not to prosecute. See Chambers v. State, 965 So.2d 376, 378 (Fla. 4th DCA 2007) ("For a confession to be admissible, it must be made voluntarily ... it must not be obtained by threats, promises, or the exertion of any improper influence ... promises not to prosecute may render a confession invalid.") (internal citations omitted). Detective Segovia's response to whether Joshua would be back in time for football practice does not indicate a custodial atmosphere to a reasonable person.
Defense counsel, borrowing from B.S. v. State, 548 So.2d 838 (Fla. 3d DCA 1989), in her brief, accurately poses the issue to be decided:
If [Ladson] went to the station because [he] had been the subject of the functional equivalent of an arrestwhich was admittedly unjustifiedthe confession *812 must be suppressed.... On the other hand, if [he] went there on [his] own accord and without coercion, there was no illegality which would preclude the validity of the confession.
Id. at 839 (internal citations omitted). In determining which category the set of facts in our case falls, our precedent directs us to follow "a process ... based upon a consideration of the `totality of the circumstances,' [the] ... relevant inquiry [being] how a reasonable man in the suspect's position would have understood his situation." Id. (internal citations omitted). Applying these rules, our case is both factually and legally distinguishable from B.S.
In B.S., the police approached B.S. at her home, "an area where a person enjoys the highest reasonable expectation of privacy under the Fourth Amendment," see Payton v. New York, 445 U.S. 573, 589-90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), where she appeared in her pajamas, at an hour one might glean was either quite early or quite late in the day, babysitting her younger brother. B.S., 548 So.2d at 838. The police told B.S. they "wanted" her to come to the station for questioning. Id. When B.S. expressed concern she could not leave her brother alone, the officers told her they would take him to the station with her. Id. at 839. That is what occurred. Based on this showing, we reversed an order denying B.S.'s motion to suppress her confession, emphasizing that the police officers "phrased their wish for the appellant to come with them in terms of what they `wanted' her to do." We said that this term "while perhaps not so coercive as an order or demand, is much closer to that end of the continuum than a clearly non-mandatory `request' or invitation." Id. at 840 (quoting 2 W. LaFave, Search & Seizure § 5,1(a) at 391).
Our case is different. Here, Joshua was not approached at home. Rather, he was approached as he walked down the street on his way to school. There is no evidence of aggressive behavior by the officers who made initial contact with Joshua. Detective Segovia testified that he "asked [Joshua] if he was willing to come and talk to [him] at the office [in] reference [of] an investigation." (Emphasis added). This testimony by Detective Segovia, which defense counsel was unable to shake on cross-examination, falls much closer to the non-mandatory end of Professor LaFave's "coercion continuum."
I am willing to accept the several considerations taken from B.S., see B.S., 548 So.2d at 839-41, advanced by both Joshua and the dissent as the "decisive" considerations in a case of this type. See Dissent Op. at pp. 17-20. However, unlike the defense and the dissent, I am of the view that only two of those four considerations exist in this case: (1) Ladson was sixteen on the morning of August 16, 2006, when he was approached by Detective Segovia, and (2) Ladson found himself in a "virtually coercive situation." See id. at 839-40. Of course, all police encounters are coercive. Police encounters with persons who are uneducated, of diminished mental capacity, or a minor, are inherently likely to be even more coercive. However, our job remains to examine the totality of the circumstances, without giving undue weight to any particular factual circumstance, and determine whether the act in question is voluntary within the meaning of the Fourth Amendment. See Kaupp v. Texas, 538 U.S. 626, 629, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) ("A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty *813 to ignore the police presence and go about his business.").
Our science is inexact, but in this case one thing is clear. Unlike B.S.where the police accosted B.S. at her home, told her they "wanted" her to come to the station, and then countered her effort to demur by stating they would take her younger brother alongthe encounter in our case happened in the middle of a residential street, at a reasonable hour, as Joshua was walking to school. There is no evidence of aggressive police tactics, and the cross-examined testimony of the lead detective was that he "asked" Joshua if he was willing to go to the police station. It is hard to divine what else the police could have done during this encounter that was not done short of expressly advising the youth the law did not require him to go to the station. However, I am unwilling to expand the exclusionary rule to impose such a requirement on officers dealing with the youth, the only deducible imperative I can draw from the frustration exhibited by the dissent in this case.
Viewing the record as a whole, I find no illegality in the police procedures employed in this case, and therefore no reason to have precluded the admission of the confession at the trial of the case.
SCHWARTZ, Senior Judge (dissenting).
I cannot accept that a sixteen year old with no previous record, who was stopped by police officers who swerved their car in front of him on his way to school, asked to come to the station with them and told whether he is able to make football practice depends on how the questioning goes, may be deemed to have voluntarily "consented" to his ensuing, otherwise constitutionally unsupportable imprisonment.
Gut reaction aside, the factual and legal analysis which supports my disbelief in the majority's conclusion to that effect is well stated in the appellant's brief. It is quoted, almost in its entirety as follows:
The trial court erred in denying Joshua Ladson's motion to suppress his statements which were obtained through custodial interrogation after his illegal arrest. Consideration of the totality of the circumstances in this case compels the conclusion that Joshua Ladson was involuntarily arrested rather than having voluntarily accompanied the officers to the police station, as a reasonable person in his position would not have believed that he was free to disobey the police officers who took him to the police station for questioning. As the police lacked probable cause to believe that he had committed any offense at the time of that arrest, and as the statements obtained shortly after the illegal arrest were not purged of their primary taint, the trial court erred in denying the motion to suppress those statements.
....
A confession is not admissible at trial if it was obtained through custodial interrogation after an illegal arrest, unless the causal chain between the arrest and the confession is broken, and the confession is "sufficiently an act of free will to purge the primary taint." Wong Sun v. United States, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).
The record in this case establishes that (1) on the morning of August 22, 2006 two members of a homicide investigative team pulled their vehicle halfway onto the grass and asked Joshua (who was on his way to school) his name, Joshua remained with these detectives until two more members of the team pulled up in another vehicle, confirmed *814 his identity and asked him if he was willing to go to the police station with them, no one told Joshua that he was not under arrest and that he did not have to come with them, they frisked him before he entered their vehicle for transport to the police station, when they arrived at the police station, Joshua was placed inside of an interrogation room in the homicide office, Miranda warnings were administered, and he was interviewed by one or two detectives at a time for several hours; (2) at the time of this de facto arrest, the police lacked probable cause to believe he had committed any offense; and (3) the statements obtained shortly after the illegal arrest were not purged of their primary taint.
....
A seizure of the person within the meaning of Fourth and Fourteenth Amendments of the United States Constitution and Article 1, Section 12 of the Florida Constitution occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. See Kaupp v. Texas, 538 U.S. 626, 123 S.Ct. 1843, 1845, 155 L.Ed.2d 814 (2003); Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); Michigan v. Chesternut, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).
....
The courts have taken into account a number of different considerations in deciding whether or not a certain situation constituted an arrest or only consensual presence. See Wayne R. LaFave, 3 Search and Seizure § 5.1(a) at 4-9 (4th ed. 2009 Update). Applying those considerations to the facts of this case compels the conclusion that Joshua Ladson was involuntarily arrested rather than having voluntarily accompanied the officers to the police station.
1. "The consideration most frequently cited in the cases finding consent is that the police specifically advised the suspect that he was not under arrest or that he was free to leave if he wished.... though it is important to note that the explanation can be nullified by other police conduct of a coercive nature ... Likewise, the cases coming down on the arrest side of the issue often note that such explanation was lacking." LaFave, § 5.1(a), at 4-5 (footnotes omitted); see Kaupp v. Texas, 538 U.S. 626, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) (defendant's transportation to police station constituted an illegal arrest where defendant taken to crime scene and then to interrogation room at the police station with no indication he was free to decline); Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (defendant's transportation to police station constituted an illegal arrest where defendant was picked up for questioning, driven to police headquarters, placed in an interrogation room, and never was informed he was free to go); B.S. v. State, 548 So.2d 838, 840 (Fla. 3d DCA 1989) (failure to advise suspect that she was not required to accompany police officers, and had every right to refuse "decisive on the side of the conclusion that compliance with police authority... is not voluntary"); compare Taylor v. State, 855 So.2d 1 (Fla.2003)[.]
....
In the present case, none of the several detectives who spoke to Joshua Ladson (either a few blocks from his home, in the car on his way to the police station, or at the station) ever told him that he was free to go or that or that he *815 was not under arrest (SR.76, 86-87, 122). The trial court, in clear error below, improperly found that this fact has "no weight in this analysis for the purposes of this second issue as to whether or not he was in custody when he was transported to the police department." (SR.122).
2. The chances of a finding of consent are enhanced if the police put the matter to the suspect only in terms of a request, but the situation is otherwise if the suspect's presence is ordered or if the initial police "request" is negated by other events. LaFave, § 5.1(a) at 4; see Kaupp v. Texas (suspect's response of "Okay" after suspect told "we need to go and talk" not a showing of consent under the circumstances); B.S. v. State, 548 So.2d at 840 ("The officers phrased their wish for the appellant to come with them in terms of what they `wanted' her to do. In our judgment, this term, while perhaps not so coercive as an order or demand, is much closer to that end of the continuum than a clearly non-mandatory `request' or invitation."); United States v. Allen, 436 A.2d 1303, 1309 (D.C.App.1981) (defendant told "you have to come to homicide with us"; deemed coercive); compare Craig v. Singletary, 127 F.3d 1030 (11th Cir. 1997) (no arrest where after defendant volunteered to help them, police asked him if he would come down to the police station, and defendant agreed to do so).
Detective Segovia testified that he asked Joshua Ladson if he was willing to go to the police station. However, when asked by Joshua if he "would be back on time to go to football practice[,]" Detective Segovia responded "that all depended on how the interviewon how the interview went." (SR.37). This response indicates that his request was in fact mandatory, not permissive.
Additionally, when the two detectives initially approached Joshua and asked him his name, they pulled their car halfway onto the grass. (SR.36). Joshua then remained with them until Detective Segovia and Detective Dominguez arrived in a second vehicle. A reasonable person in this situation would not have believed he was free to leave. See G.M. v. State, 19 So.3d 973 (Fla.2009).
3. "Resort to physical restraint is almost certain to result in a holding that an arrest had been made .... while the lack of such restraint is a consideration pointing toward consent.... But the situation can amount to an arrest even though there were no formal words of arrest and no booking." LaFave, § 5.1(a) at 4 (footnotes omitted).
When the two detectives initially approached Joshua they pulled their car halfway onto the grass and asked him his name. (SR.36). From that point forward, when two more detectives came to the scene, he was at all times in the presence of officers. While being transported to the police station, Joshua was seated in the front seat and not handcuffed, but he was frisked prior to entering the car. At the police station, he was kept inside an interrogation room and officers were either present inside the room or outside the room at all times.
At least one Florida court has found that the giving of Miranda warnings converts a consensual encounter into an arrest. See Raysor v. State, 795 So.2d 1071 (Fla. 4th DCA 2001) (en banc).
....
"Because Miranda rights are not required to be read to suspects unless they are undergoing custodial interrogation, it follows that a person who has been read his Miranda rights would reasonable assume that he is not free to leave." *816 Raysor, 795 So.2d at 1072 (citation omitted). But see Caldwell v. State, 985 So.2d 602 (Fla. 2d DCA 2008), review granted 7 So.3d 1097 (Fla.2009) (disagreeing with the Fourth District and finding that an officer who contacted defendant did not transform a consensual encounter into an illegal seizure by giving Miranda warning); LaFave, § 5.1(a) at 4 ("Moreover, `the issuance of Miranda warnings as a cautionary measure' does not itself transform the situation into a Fourth Amendment seizure.") (footnote omitted).
In this case, Joshua Ladson was given his Miranda warnings and signed a written waiver of these rights. Pursuant to Raysor, this fact evidences that a reasonable person would not assume that he is free to leave.
5. "Various [additional] circumstances can contribute to the conclusion that the defendant's presence at a police facility or in a police environment was voluntary. Included are that the suspect appeared at the station without there being any prior police request that he do so .... that he actually volunteered to appear when he learned the police were interested in speaking with him .... that he appeared following a request from the police which reached him via a third party .... that he determined the time and place of the police contact .... that he transported himself to the police facility ... or that he actually stated he did not view the encounter as an arrest.... Courts also take into account facts tending to show that the suspect `deliberately chose a stance of eager cooperation in the hopes of persuading the police of his innocence.'" LaFave, § 5.1(a) at 4 (footnotes omitted).
None of these factors indicating consent are present in this case.
6. "Other circumstances which are coercive in nature or which limit the suspect's options, on the other hand, are likely to influence a finding that consent was lacking. Included here are such circumstances as that police were holding some of the suspect's effects .... that they deprived him of his means of departure .... that the suspect was aware the police already had substantial evidence of his criminal involvement.... that many officers were involved in the encounter .... or that the suspect was subjected to intensive interrogation.... Obviously, the youth or inexperience of the suspect must also be taken into account." LaFave, § 5.1(a) at 4 (footnotes omitted).
Several of these factors indicating that an arrest took place are present in this case. Four different detectives were involved in the encounter with Joshua Ladson. There was no evidence that he was experienced with the criminal justice system. (SR.131). Additionally, and significantly, Joshua Ladson was a 16 year old juvenile at the time he was taken to the police station. See B.S. v. State, 548 So.2d at 839-840 ("Of foremost importance is the simple fact that B.S. was a seventeen-year-old juvenile. Youth has often been held almost necessarily to involve a vulnerability to the wishes of adult authority figures like policemen which is the antithesis of an exercise of the child's free will.... See Schneckloth v. Bustamonte, 412 U.S. at 248, 93 S.Ct. at 2058, 36 L.Ed.2d at 875 (`The traditional definition of voluntariness we accept today has always taken into account evidence of minimal schooling [and] low intelligence....') ... Again, the fact that it is a juvenile who is told that adult officers "want" her to come in surely bears negatively on her ability to resist."); Kaupp v. Texas, 123 S.Ct. at 1847 (17-year-old defendant's *817 transportation to police station constituted an illegal arrest; "a group of police officers rousing an adolescent out of bed in the middle of the night with the words `we need to go and talk' presents no option but `to go.'").
In light of these factors, the consideration of the totality of the circumstances in this case compels the conclusion that Joshua Ladson was involuntarily arrested rather than having voluntarily accompanied the officers to the police station, as a reasonable person in his position would not have believed that he was free to disobey the police officers who took him to the police station for questioning.
This court's decision in B.S. v. State is illuminating as it involves application of the considerations listed in Lafave to reach the conclusion that a 17-year-old juvenile was involuntarily arrested rather than having voluntarily accompanied police officers to the police station.
....
On appeal, this court first set forth the "legal parameters" of the issue to be decided:
If B.S. went to the station because she had been the subject of the functional equivalent of an arrestwhich was admittedly unjustifiedthe confession must be suppressed as the tainted product of that improper incarceration.... On the other hand, if she went there on her own accord and without coercion, there was no illegality which would preclude the validity of the confession.
548 So.2d at 839 (citations omitted). This court then noted that determining into which category a particular set of facts falls is a process which must be based on the totality of all the surrounding circumstances, and that the only relevant inquiry is how a reasonable person in the suspect's position would have understood the situation. This court looked to the considerations listed in § 5.1(a) of LaFave and concluded that B.S. had been involuntarily detained:
1. Of foremost importance is the simple fact that B.S. was a seventeen-year-old juvenile. Youth has often been held almost necessarily to involve a vulnerability to the wishes of adult authority figures like policemen which is the antithesis of an exercise of the child's free will.... 2 W. LaFave, Search & Seizure § 5.1(a), at 392 ("Obviously, the youth or inexperience of the suspect must also be taken into account.")
* * * * * *
1. It is admitted that, despite the virtually inherently coercive situation in which B.S. found herselfone in which even an enunciation of the policeman's wishes might naturally have led her to think they must be obligedthe officers did not disabuse her of this belief by specifically telling the girl that, as was indeed the case, she was not required to accompany them and had every right to refuse. Such a failure is decisive on the side of the conclusion that compliance with police authoritymade without specific knowledge of the right to refuseis not voluntary. As LaFave says:
The consideration most frequently cited in the cases finding consent is that the police specifically advised the suspect that he was not under arrest or that he was free to leave if he wished. Likewise, the cases coming down on the arrest side of the issue often note that such explanation was lacking....
2 W. LaFave, Search & Seizure § 5.1(a), at 390-91, and cases cited at nn. 23-24 (footnotes omitted). Moreover, the coercive effect of a lack of *818 contrary explanation is emphasized when a child, who might be even less expected to know or act upon his rights, is involved.
* * * * * *
3. The officers phrased their wish for the appellant to come with them in terms of what they "wanted" her to do. In our judgment, this term, while perhaps not so coercive as an order or demand, is much closer to that end of the continuum than a clearly non-mandatory "request" or invitation. See 2 W. LaFave, Search & Seizure § 5.1(a), at 391, and cases collected at nn. 26-28.
* * * * * *
4. Just as significant are the other, perhaps unique, circumstances involved in this case. Faced with the information that the child was home alone with her younger brother, the officers neither waited for her mother to return, nor decided to leave and come back later themselves.... Instead, they waited while the appellant changed from her pajamas and drove her to the police station with her brother in tow. The only impression this series of events could reasonably evoke is that the officers were not going to take no, or even a delayed yes, for an answer and that no opposition to their desires would do any good.
* * * * * *
In sum, we find that, as a matter of law B.S.'s presence in the police station was not procured through her voluntary consent and the confession which resulted should have been suppressed.
548 So.2d at 839-841.
Three of the four factors which led this court to hold in B.S. that the 17-year-old juvenile did not voluntarily accompany the officers to the police station are present in this case as well. And although this case does not involve the same situation that officers who were faced with information that the child was home alone with her younger brother neither waited for the mother to return nor decided to leave and come back later themselves, but rather drove her to the police station along with her younger brother, this case has the fact that the officers waited until Joshua left his home alone to walk to school. (SR.30-31). Instead of waiting outside of his home to catch him "alone" on his way to school, the officers could have knocked on the door to his home where he lived with his mother and brother.
Independent consideration of all the factors deemed relevant by the courts and the leading treatise on the subject supports the conclusion that Joshua Ladson was involuntarily arrested rather than having voluntarily accompanied the officers to the police station.
Although it seems clear that B.S. presents what is probably an a fortiori situation and thus requires reversal in this case, the majority barely acknowledges its existence. Its reasons for failing to follow it are, with respect, unpersuasive.
It is not enough, as the court says, that the trial judge, as she surely did, conscientiously fulfilled her duty of determining what she sincerely believed to be the correct result. Under our system it is our nondelegable obligation to determine whether that result, however regularly arrived at, was legally right.[8],[9]
*819 Let's face facts, the only real difference with B.S. is that it involved a minor (in both senses) theft of money and this one was a homicide (which appellant undoubtedly committed). But there is no serious crime-obvious guilt-indispensible-to conviction exception to the law that evidence secured in violation of the Constitution is not admissible. It is unfortunate that the majority creates and applies that heretofore only mythical doctrine in this case. I believe its determination to do so is very wrong.
NOTES
[1] The lead detective was the only witness who testified during the hearing on the motion to suppress. We report and review the historical facts in the light most favorable to the State. Connor v. State, 803 So.2d 598, 608 (Fla.2001). We review the trial court's application of law to those facts de novo. Id.
[2] On cross-examination, the detective testified that he had told Ladson he was free to go, "from the get-go." The trial court found that such a statement was not made, but also gave that fact no weight in the analysis "as to whether [Ladson] was in custody when he was transported to the police department."
[3] The detective also asked if there was anyone else to contact. Ladson told him that his mother was the only person to contact, and that she was at a doctor's appointment and would not be accepting calls for a couple of hours.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The preliminary questions elicited responses from Ladson that he was not under the influence of drugs or alcohol, he had completed tenth grade, he did not have any mental or medical problems, and he had eight hours of sleep the previous night.
[5] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[6] The trial court's reliance on this and other reasoning in Caldwell was warranted; the Florida Supreme Court later approved that Second District decision (and disapproved a conflicting decision from another district) in Caldwell v. State, 41 So.3d 188 (Fla.2010), discussed in additional detail below.
[7] Gonzalez v. State, 59 So.3d 182 (Fla. 4th DCA 2011).
[8] The identities of the trial and appellate judges in the individual case are of no moment. The appellate court must prevail because that is the way we operate. In short, as has often been said, we are not last (or at least later) because we are right, we are right because we are last.
[9] It also makes no difference that B.S. was only a split decision with a well-reasoned dissent. In this court, even a misguided majority rules.