PER CURIAM.
Joshua Ladson appeals his conviction of manslaughter by culpable negligence with a firearm, as a lesser included offense of second degree murder with a firearm, and his sentence. He contends that the trial court erred in denying his motion to suppress his confession. We affirm.
The testimony at the suppression hearing established that a homicide detective for Miami-Dade County was assigned to investigate the shooting death of a motorcyclist. After receiving numerous Crime Stoppers tips, the detective identified Ladson as a person of interest during the week following the shooting. At the time, Ladson was 16 years old. On the morning of the ninth day following the shooting, the detective and three other officers on his investigative team surveilled Ladson’s home, anticipating a chance to speak with him as he left for school.[1]
*808 Although initially distracted by the departure of Ladson’s older brother from the home, the team ultimately observed Lad-son leaving the back of the house, followed him, and asked him for identification. The lead detective then asked Ladson, with Ladson standing outside the police car and not in handcuffs, whether he was willing to come and talk further with the detective further about an investigation. Ladson said “no problem,” but he did ask if the detective thought Ladson could be back in time to go to football practice. The detective responded that it depended on how the interview went. The detective did not tell Ladson that he did not have to accompany him to the police station.[2]
Ladson was frisked for officer safety outside the police car before the drive to the police station. He sat in the front seat of the police car and was not handcuffed. The lead detective asked Ladson for a parent’s telephone number and tried unsuccessfully to contact his mother.[3] At the station, Ladson was taken to an inteiwiew room. He was offered something to drink, food, and bathroom breaks, and he was told that he could ask for any of those at any time. After about ten minutes of preliminary interview questions, he signed a written Miranda[4] warning.
The officers made four separate calls to reach Ladson’s mother or father, but these were unavailing until later in the day. Initially, Ladson denied any knowledge of, or involvement in, the shooting. Later (a little over two hours after his arrival at the station), Ladson implicated another person in the shooting, and then claimed that his half-brother had fired the gun that killed the victim. About three hours after he arrived at the station, Ladson admitted to being the shooter. After additional questions and a break for food, Ladson was again given his Miranda rights and the lead detective obtained a sworn statement (transcribed and videotaped). The lead detective testified that he did not consider Ladson to be in custody until after he provided the sworn statement.

Analysis

The trial court held that Ladson’s first encounter with the police as he was walking away from his back door was consensual, and not a Terry[5] stop. The court found that Ladson accompanied the officers voluntarily and that the frisk for officer safety before the drive to the police station also was voluntary, relying upon Caldwell v. State, 985 So.2d 602 (Fla. 2d DCA 2008).[6]
*809 The trial court then analyzed the Miranda requirements appropriately under the tests established in Ramirez v. State, 739 So.2d 568, 574 (Fla.1999), and Roman v. State, 475 So.2d 1228, 1281 (Fla.1985). The question presented on review is whether any reasonable person in Lad-son’s position would have believed that functionally he was under arrest and not free to go.
As the Florida Supreme Court has recently reiterated, these are fact-laden inquiries depending “heavily on the circumstances of the specific encounter at issue.” Caldwell, 41 So.3d at 199. The trial court’s assessment of the credibility of the lead detective is entitled to deference here.
Ladson and our dissenting colleague have urged us to follow B.S. v. State, 548 So.2d 838 (Fla. 3d DCA 1989). In B.S., a 17 year-old was told by two detectives at her home (in the absence of a parent, and while baby-sitting her younger brother) that they “wanted” her to come to the station for questioning. When she expressed concern that she could not leave her brother alone, the officers told her that they would take him to the station with her (and did exactly that). Id. at 839. This Court concluded, with a dissent, that this scenario was functionally equivalent to an arrest and reversed a trial court order denying a motion to suppress her confession.
These cases are fact-intensive and occasionally close (to address our learned colleague’s criticism for mentioning that there was a dissent from his majority opinion in B.S. in 1989). Our colleague’s enthusiastic dissent in this case is reflected in other recent commentaries on the evolution of the law of “consent:”
Over time, the concept of “consent” to a search has become divorced from its common meaning. In the Fourth Amendment context, “consent” has come to mean that set of circumstances that the law will tolerate as an exception to the probable cause or warrant requirement. What passes for “consent” today would not have survived a motion to suppress 25 years ago. Now, even aggressive conduct by the police will not necessarily vitiate “consent” when viewed as part of the “totality of the circumstances.” Thus, in Golphin v. State [,945 So.2d 1174 (Fla.2006)], the Supreme Court rejected the concept that, as a matter of law, an otherwise consensual encounter matures into a seizure when an officer retains a person’s identification to conduct a check for outstanding warrants. Id. at 1187-89. Similarly, in Caldwell v. State, 41 So.3d 188 (Fla.2010), the Supreme Court held that the administration of Miranda warnings, as a matter of law, does not transform a consensual encounter into a seizure. Under Golphin and Caldwell, the challenged police conduct was but one factor to be considered in the totality of the circumstances.
The “totality of the circumstances” approach has expanded the concept of “consent” in a way that has had a significant effect on the administration of criminal justice. It allows a trial court to rely on other factors that swallow aggressive police conduct and contract the limits of Fourth Amendment protection.
Ruiz v. State, 50 So.3d 1229, 1231-32 (Fla. 4th DCA 2011). In Ruiz, and in Judge Hazouri’s special concurrence citing Ruiz,[7] however, the trial court’s denial of a motion to suppress based on “consent” was affirmed. In those cases, as here:
*810 ... [A]s an appellate court, we must defer to the express finding of credibility by the trial court. We were not there. We did not see the witnesses testify. If believed, the detective’s testimony supports the court’s ruling.
Id. at 1233. The trial judge in this case, as in Ruiz, “punctiliously performed the duties of [her] office in this case” and did not “devolve into a rubber stamp for law enforcement.” Id.
After a careful review of the record in this case, we conclude that the trial court diligently applied Ramirez and Caldwell (the ultimately-approved district court opinion in that case) to the police interaction with Ladson as it moved from initial encounter to confession. We will simply agree to disagree with our respected colleague as to (a) whether the manner in which the detective parked his vehicle in the swale alongside the street travelled by Ladson, and the scenario when a second vehicle arrived (neither vehicle activated emergency lights), were coercive; (b) whether the majority opinion in B.S. 22 years ago is distinguishable on its own facts; and (c) whether the majority has created and applied some “mythical doctrine.”
Affirmed.
SHEPHERD and SALTER, JJ., concur.

. The lead detective was the only witness who testified during the hearing on the motion to suppress. We report and review the historical facts in the light most favorable to the State. Connor v. State, 803 So.2d 598, 608 (Fla.2001). We review the trial court's application of law to those facts de novo. Id.

. On cross-examination, the detective testified that he had told Ladson he was free to go, “from the get-go.” The trial court found that such a statement was not made, but also gave that fact no weight in the analysis "as to whether [Ladson] was in custody when he was transported to the police department.”

. The detective also asked if there was anyone else to contact. Ladson told him that his mother was the only person to contact, and that she was at a doctor’s appointment and would not be accepting calls for a couple of hours.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The preliminary questions elicited responses from Ladson that he was not under the influence of drugs or alcohol, he had completed tenth grade, he did not have any mental or medical problems, and he had eight hours of sleep the previous night.

. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. The trial court’s reliance on this and other reasoning in Caldwell was warranted; the Florida Supreme Court later approved that Second District decision (and disapproved a conflicting decision from another district) in Caldwell v. State, 41 So.3d 188 (Fla.2010), discussed in additional detail below.

. Gonzalez v. State, 59 So.3d 182 (Fla. 4th DCA 2011).